UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JENIFER O'BRIEN,

        Plaintiff,

v.                                          Case No. 05-C-789

LANGLADE COUNTY and ROBERT WILSON,

        Defendants.

**DECISION AND ORDER**

      Plaintiff Jenifer O'Brien filed this lawsuit alleging a hostile work environment at her former employer, the Langlade County Veterans Service Office; she also alleges she was retaliated against for filing a discrimination complaint. Defendants have moved for summary judgment, asserting that even if all of her allegations are taken as true, they do not add up to a hostile work environment. In the alternative, Langlade County asserts that it cannot be held accountable, as the employer, for the activities of defendant Robert Wilson. It also asserts that the employment actions taken after the discrimination complaint was filed do not amount to retaliation. For the reasons given below, the motion will be granted.

**I. Hostile Work Environment**

      Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination may be direct and specific, or it may take the form of a work environment hostile to the plaintiff. To succeed on a hostile work environment claim, O'Brien must show the following:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists.

*Phelan v. Cook County,* 463 F.3d 773, 783 (7th Cir. 2006).

The dispute in most hostile work environment cases is over whether the conduct and speech complained of was merely harmless "locker room" style banter, or whether it crossed the line into objective hostility. "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir.2000) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998)). It is often repeated that Title VII did not create a "civility code" requiring Victorian etiquette and fastidious propriety in the workplace. *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 81 (1998). The question, then, is whether the conduct complained of was so offensive that it actually transformed the conditions of the plaintiff's employment and created an abusive working environment.

With these considerations in mind, I will set forth the substance of the behavior in question and, because the matter is before me on a motion for summary judgment, I will assume the plaintiff's version of events is true.[1] O'Brien's proposed findings of fact set forth a detailed summary of dozens of events involving defendant Robert Wilson, O'Brien's supervisor in the three-employee office of the Langlade County Veterans Service Office. Many of these proposed findings relate relatively innocuous instances of innuendo or other nonactionable, albeit impolitic, behavior.

---

[1] Some of the events may fall outside of the statute of limitations period, but are generally consistent with the events recounted within that period.

For instance, Wilson allegedly enjoyed boasting about his sexual encounters and described the kinds of lingerie he would purchase his girlfriends. (PPFOF ¶¶ 1, 69.) He would frequently leer, or "gawk" at the plaintiff while she was working. (PPFOF ¶ 2.) Sometimes, to get a better view of her, Wilson would sit at a table away from his desk. He would at times comment on her appearance, noting that she was cute, or remarking that her "ass looks so good in those jeans." (PPFOF ¶¶ 12, 13.) Once, while the two were taking an exam as part of a training program, Wilson finished early and began talking to O'Brien and touching her hair with a pen. (PPFOF ¶¶ 19-24.) On another occasion, Wilson found the word "penis" in the dictionary and pointed it out to O'Brien. (PPFOF ¶¶ 33-35.) While at a hotel together for a work event, Wilson purposely answered his hotel room door with his shirt off. (PPFOF ¶¶ 26-27.) When she contacted him at his home while he was on vacation, Wilson stated his desire that O'Brien and her co-worker, Sally Schleinz, "come over and lay me." (PPFOF ¶ 37.) He also spread a rumor that O'Brien had slept with a veterans service officer from another district, which O'Brien (who was married) found degrading and offensive. (PPFOF ¶ ¶ 6-11.)

These events, many of which, it should be noted, Wilson disputes, paint the picture of a supervisor with a sophomoric sense of humor and a lack of discretion, but they likely do not amount to an objectively abusive work environment.[2] However, O'Brien describes an additional incident in her brief which, if supported by the record, would tip the balance in her favor:

---

[2] It should also be noted the Sally Schleinz, who worked in the same small office as Wilson and O'Brien, denies any knowledge of most of the incidents O'Brien describes and states that O'Brien never expressed any discomfort about Wilson's treatment of her. Schleinz also states that "it was common in the office for Jennifer O'Brien and Bob Wilson to exchange humor involving sexually inuendo" (Schleinz Aff. ¶ 10.), and that on many occasions O'Brien would initiate it. (*Id.*)

3

> Plaintiff had testified that when she was at the postage machine in the office she was touched by Wilson in a sexual way. The front of Wilson's pants were put up against the backside of the Plaintiff. This was not a "trivial brushing" as the Defendant would wish to characterize, this was an overt, concerted act that was demeaning to the Plaintiff, which was done when the Plaintiff was bending over the postage machine. Wilson came up from behind and had his front trousers' [sic] touching her back side and then proceeded to go through gyrating simulated motions of intercourse while holding her hips—this was no inoffensive act, but a highly offensive and premeditated act on the part of the supervisor, tantamount to an assault.

(Pl.'s Br. at 6.) At another point in her brief, O'Brien describes Wilson's conduct as a "demeaning act of 'dry-humping' the Plaintiff from behind when she was standing. (Pl.'s Br. at 3.)

The evidentiary record, however, does not support the lurid description of the incident set forth plaintiff's brief. In her initial report of the incident to the Corporation Counsel, O'Brien stated that Wilson came up behind her to look at the meter and, "[r]ather than waiting for me, or ask me to move he brushed up behind, at which time I immediately moved out of his way." (Wistrom Supp. Aff., Ex. 3.) Although in her later statement to the County Board and in her complaint O'Brien alleges that Wilson "brushed/pushed his crotch to her butt" (Wistrom Supp. Aff., Ex. 12; compl. ¶ 9(j)), in none of her previous accounts, including two separate depositions in which the incident was addressed, did O'Brien even suggest that Wilson put his hands on her hips and engage in simulated acts of intercourse or "dry-humping." Even in her affidavit filed in response to defendants' motion for summary judgment, O'Brien says nothing about Wilson putting his hands on her, "gyrating," or "dry-humping," although she now claims "there is no doubt that I felt the front of his pants in my backside and the action simulated a sexual act." (O'Brien Aff. ¶ 31.) And unlike her earlier accounts where she claims to have immediately moved away, O'Brien also now states that the incident lasted "about 3-4 seconds." (*Id.*)

4

Because these types of cases involve subtle gradations and normative evaluations of allegedly offensive conduct, the Seventh Circuit has provided some guidance on where certain types of behavior fit on the continuum. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.,* 455 F.3d 812, 816 (7th Cir. 2006) (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995) (citations omitted)). The court in *Patton* recognized that a single severe incident could result in a hostile environment, but that the most common scenario involves a combination of comments and behavior of varying levels of offensiveness. *Id.*

*Patton* is instructive. There, like here, the allegations involved a combination of sexually charged comments and physical contact. As to the physical contact, the court noted that context and common sense are important: a kiss can be a peck on the cheek between friends, or it can be an offensive and aggressive event, as in *Hostetler v. Quality Dining, Inc.*, where the co-worker grabbed the plaintiff's head and forced his tongue into her mouth. 218 F.3d 798, 809 (7th Cir. 2000). The court in *Patton* found it significant that "[t]he conduct described by Patton was not a mere touching of the thigh; Ramey (according to Patton) ran his hand all the way up her inner thigh, under her shorts until he touched her underwear." 455 F.3d at 817. This level of forced intimacy, the court found, was sufficient to allow a jury to conclude that the plaintiff's work environment was objectively hostile. *Patton* also makes clear that where physical contact occurs in combination with a history of verbal abuse, a jury may find a hostile work environment even though neither the contact nor the verbal abuse would be sufficient by itself. "Ramey's groping of Patton under her

5

shorts might be sufficient alone to create an abusive working environment. But it was not the sole act. Ramey had already raised the alleged rumor of a sexual affair between himself and Patton. At least two people-Patton and Miller-agreed that Ramey leered at her in an obsessive manner." *Id.*

Even though the evidentiary record does not support the more lurid account of the postage meter incident contained in plaintiff's brief, it does support an incident involving intentional intimate touching when viewed in the light most favorable to the plaintiff as it must be at this stage of the proceeding. Although the question is close, I conclude that, as in *Patton,* a jury could find a hostile work environment based on the combination of the leering, the spreading of sexual rumors, and the touching, especially given the context of the ambient sexual innuendo and commentary coming from Wilson. I therefore proceed to consideration of the *Ellerth/Faragher* defense.

**II. *Ellerth / Faragher* defense**

The defendants argue at some length that even if a jury could find a hostile work environment based on the above facts, the county cannot be liable because it took reasonable steps to prevent sexual harassment and O'Brien failed to use the county's internal corrective procedures.[3] Because a basis for employer liability is an element of a hostile work environment claim, *Phelan v. Cook County,* 463 F.3d at 783, the absence of any such basis means the plaintiff loses.

---

[3]The plaintiff all but ignores this defense. The plaintiff has sued Wilson individually, but it appears he is sued only under 42 U.S.C. § 1983 for retaliating against the plaintiff. Title VII does not provide a cause of action against defendants acting in their "individual" capacity. *See Huckabay v. Moore,* 142 F.3d 233, 241 (5th Cir. 1998) (noting that if defendant "acted only in his individual capacity, he did not act as an 'employer' and would not be liable under title VII to the extent that he acted individually.") Since filing the complaint, the plaintiff has not pursued any claim against Wilson, and so any claims against him do not survive the motion for summary judgment.

6

Generally, an employer is strictly liable under Title VII when the harassment comes at the hands of a supervisor. But employers have an affirmative defense when the harassment does not result in a tangible employment action, such as a firing or demotion. *Williams v. Waste Management of Illinois,* 361 F.3d 1021, 1029 (7th Cir. 2004). As set forth in the Supreme Court's companion decisions in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), this so-called "*Ellerth / Faragher*" defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 952 (7th Cir. 2005) (quoting *Ellerth,* 524 U.S. at 765).

**1. There was no "tangible employment action"**

As noted, the *Ellerth / Faragher* defense is only available when there has been no "tangible employment action," so as a preliminary matter I must determine whether the plaintiff suffered such an action. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761. Although O'Brien quit her job, she alleges she did so because she was constructively discharged.

Constructive discharge can, in some situations, constitute a tangible employment action for *Ellerth / Faragher* purposes. The Seventh Circuit has summarized the applicable requirements for finding constructive discharge in these circumstances:

> In order to show that a hostile work environment resulted in her constructive discharge, [plaintiff] must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her

7

>resignation was an appropriate response. Constructive discharge refers to a situation "in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable." . The "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress."

*McPherson v. City of Waukegan,* 379 F.3d 430, 440 (7th Cir. 2004).

Although I concluded a jury could find a hostile work environment based on the plaintiff's version of events, it does not follow that the facts underlying O'Brien's claim of constructive discharge constitute a tangible employment action. Several reasons suggest themselves.

First, the events described above, while serious enough to allow a jury to find a hostile work environment, do not amount to a scenario so offensive that any reasonable individual would have no choice but to quit. Second, Wilson's harassment ended some two months before the plaintiff quit. O'Brien filed a complaint with the corporation counsel in early January 2004, and the county took swift action and developed a corrective action plan. At the time she quit on February 20, the only types of hostility she reports is getting the "cold shoulder" from her co-workers, or experiencing "hyper scrutiny" from Wilson himself. If true, it could render the workplace uncomfortable, but not so intolerable that it would constitute constructive discharge.

Finally, it is doubtful that the actions complained of here constitute the sorts of official "tangible employment actions" that would render the *Ellerth / Faragher* defense unavailable. Remember that at this stage we are dealing not with the alleged hostility of the plaintiff's workplace but with the question of whether there is a basis for employer liability. In that context, constructive discharge only constitutes a tangible employment action when it bears some indicia that the acts complained of were officially sanctioned by the employer. For example, in *Robinson v. Sappington*

8

the Seventh Circuit found that constructive discharge was a tangible employment action because the constructive discharge resulted from the actions of the presiding judge of the district:

> This was not simply a situation in which a supervisor was inflicting harassment on a subordinate. In this case, Judge Greanias, in his capacity as presiding judge, took the official action of transferring Ms. Robinson to Judge Francis and made the suggestion that she resign. The transfer was only possible because Judge Greanias "ha[d] been empowered by the [employer] . . . to make economic decisions affecting other employees under his or her control.". Furthermore, the suggestion that Ms. Robinson resign was given added effect because Judge Greanias was speaking in his official, supervisory capacity when the suggestion was made. Consequently, because a jury could determine that Ms. Robinson's decision to resign resulted, at least in part, from Judge Greanias' official actions in transferring Ms. Robinson to Judge Francis and in suggesting that she resign, we believe that it would be appropriate to hold the State of Illinois liable for Ms. Robinson's resulting resignation.

351 F.3d 317, 337 (7th Cir. 2003) (citations omitted). In contrast, this case *is* "simply a situation in which a supervisor was inflicting harassment on a subordinate." *Id.* There is no indication that Wilson's behavior was officially sanctioned – indeed, it ceased as soon as others were notified of his behavior. As such, it was not the kind of official action that would be deemed a tangible employment action attributable to the employer. Accordingly, I conclude that the *Ellerth* / *Faragher* defense is available to the defendants.

**2. The county corrected the harassing behavior promptly**

The first element of the *Ellerth* / *Faragher* defense requires the defendant to have exercised reasonable care to prevent and correct any sexually harassing behavior. The county argues that because it had a comprehensive sexual harassment policy in place, it exercised reasonable care to prevent and / or correct such behavior. The Seventh Circuit has noted that one of Title VII's purposes was to encourage employers to develop anti-harassment policies. *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999). Thus, when an employer has a meaningful policy in place, that

9

will typically suffice to demonstrate that it exercised care to prevent and correct such behavior. *Id.* (noting that AutoZone's policy made clear "that sexual harassment will not be tolerated, and provided for multiple mechanisms for the prompt resolution of complaints.") *See also Jackson v. County of Racine,* — F. 3d —, 2007 WL 174681, *7 (7th Cir. 2007) (observing that "[a]t the time these incidents took place, the County had a comprehensive anti-harassment policy in effect that plainly covered sexual harassment.")

Langlade County had in place a comprehensive sexual harassment policy. (Stowe Aff., Ex. A.) The policy, adopted in 1992, prohibits every sort of communication relating to sexual or personal topics. The policy also forbids almost every form of physical contact. As pertinent here, the policy prohibits making sexual jokes, asking personal questions, as well as suggestive leering, touching, hugging, or even brushing up against a person. (*Id.* at 4-5.) The policy includes a complaint procedure which directs employees to report offensive behavior to their department head or the corporation counsel. (*Id.* at 5.) The plaintiff admits that she received this policy upon beginning her work for the county. (DPFOF ¶ 70.) There is thus no indication that this case differs materially from the cases cited above in which the existence of a *bona fide* harassment policy sufficed to demonstrate that the defendant took reasonable steps to prohibit harassing behavior.

Along the same lines, the evidence shows that the county responded sternly to the harassment complaint. Soon after O'Brien filed her complaint, the corporation counsel initiated an investigation that resulted in Wilson being given a five-day suspension and receiving a written reprimand. He was ordered to apologize to O'Brien and attend 50 hours of training without pay. Plaintiff admits that she did not experience any harassment from Wilson after she complained. (DPFOF ¶ 88.) In fact, as discussed further below, the plaintiff actually contends that in some

10

respects the county's reaction was *too* strict, inasmuch as it required her to take her bathroom breaks at the same time as her co-worker Sally Schleinz. Accordingly, I find it undisputed that the defendant followed its harassment policy and acted promptly to correct the behavior complained of by the plaintiff.

**3. Plaintiff failed to use available procedures**

The second prong of the defense turns the focus from the defendant's conduct to the plaintiff's. As the Supreme Court observed in *Faragher,*

> An employer may, for example, provide a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Faragher,* 524 U.S. at 806-07.

The requirement that plaintiffs use the complaint procedures available to them is based on Title VII's design as a preventative statute rather than a compensatory one. In other words, Title VII was designed to reward employers who develop discrimination policies and create grievance systems more than it was geared toward providing damages for every instance of harassment. *Id.* at 805-06.

The county argues that O'Brien cannot recover here because she did not take advantage of the county's complaint procedure until January 2004, at which point the harassment stopped. The defendant cites *Gawley v. Indiana University*, a case raising a nearly identical situation.

> Minger harassed Gawley for a period of approximately seven months. At times, he made up to three inappropriate comments to her each day. During this time, she told

11

> Minger at least ten times to stop harassing her. Even though her informal approach was not working, she waited seven months before availing herself of the formal complaint procedures available through the university. As soon as she used the formal procedures, which did not require her to complain to the harasser but provided an alternate channel for her complaint, the university took action and the harassment stopped. Gawley's neglect of the university's formal procedures during seven months of escalating harassment, in combination with the insufficiency of her repeated informal efforts to stop Minger constitute an unreasonable failure to take advantage of the university's corrective procedures.

276 F.3d 301, 312 (7th Cir. 2001).

The plaintiff does not dispute that she did not file her complaint until January 2004. Nor does she claim she acted reasonably in failing to do so – in fact, as noted earlier, the plaintiff all but ignores the *Ellerth / Faragher* defense raised by the defendant. Here, as in *Gawley,* the grievance procedures she ultimately used allowed her to bypass Wilson and go straight to the corporation counsel. The fact that corrective action resulted so swiftly when she ultimately complained is a testament to the efficaciousness of that policy and suggests that much of the harassment now complained of could have been avoided. In sum, I conclude the county has met its burden to demonstrate that it took reasonable steps to prevent and correct discrimination and that the plaintiff failed to take advantage of the policies and procedures it afforded her. Accordingly, the motion for summary judgment will be granted on the plaintiff's hostile work environment claim.

**III. Retaliation**

Finally, O'Brien argues she was retaliated against for filing the January 2004 complaint against Wilson. The period in which the alleged retaliation occurred is quite brief. On January 6, O'Brien submitted a written complaint to the corporation counsel, Robin Stowe. The next week, the county board's personnel committee met to discuss the allegations and interviewed Wilson, O'Brien and Schleinz. The committee suspended Wilson for a week and issued him a written reprimand. Stowe also wrote to O'Brien and Wilson explaining that O'Brien would be excused

12

from working whenever the two of them would have to work together without the presence of a third party. (Stowe Aff., Ex. I.) This would continue "until such time as Jenifer notifies the county in writing that she is able to work with Bob Wilson without someone else being present in the office." (*Id.*) O'Brien appealed the board's decision and, after it was upheld, returned to work on January 26. Ultimately, she resigned her position on February 20, only a month after she returned to work.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). For a plaintiff to establish a *prima facie* case of retaliation under Title VII, she must demonstrate that: 1) she engaged in a protected activity under Title VII; 2) she suffered an adverse action that would tend to discourage a reasonable employee from engaging in that activity; and 3) there was a causal link between the two. *Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2415 (2006); *Stutler v. Illinois Dept. of Corrections,* 263 F.3d 698, 702 (7th Cir. 2001).

At issue in this case are the second and third prongs of the *prima facie* case: the county argues that some of the actions O'Brien complains of were not severe enough to constitute retaliation, while other actions were not linked to any retaliatory motive. Turning first to the question of motive, what makes the plaintiff's case unusual is that most of the actions she cites as retaliatory are the very same actions the county took to *correct* the harassment she brought to its attention. In other words, in her view the cure was worse than the disease. For example, she argues that the county responded to O'Brien's complaint by requiring that O'Brien and Wilson could never

13

be alone together in the same room. The result of this policy was that O'Brien had to take her bathroom breaks at the same time as the other female employee in the office, lest she remain behind alone with Wilson. This was undoubtedly an uncomfortable state of affairs that could have been avoided had the county fired or transferred Wilson.[4]

The county defends its response to O'Brien's complaint by arguing there was no retaliatory motive. That is, even if the resulting situation was objectively unpleasant, there is no evidence that any individuals involved in crafting the corrective action had any motivation to retaliate against the plaintiff. *Nair v. Nicholson,* 464 F.3d 766, 769 (7th Cir. 2006) (noting that "the motive must be to retaliate for activity protected by Title VII."). Such was the case in *Place v. Abbott Laboratories,* in which the employer created an arrangement allowing the plaintiff and the harassing employee to interact only in the presence of a third party. 215 F.3d 803, 810-11 (7th Cir. 2000). The court noted that all sorts of unpleasant conditions ensued after the plaintiff complained, but that these did not constitute retaliation so much as the unavoidable consequences of damaged work relationships: "an employer's decision to split up two workers whose interpersonal problems are impeding the company's progress is not retaliation." *Id.* at 811. The same was true in *Stutler v. Illinois Dept. of Corrections,* 263 F.3d 698, 703 (7th Cir. 2001). There, the court found no evidence of retaliatory motive in the employer's decision to transfer an employee:

> Even if the transfer could rise to the level of an adverse employment action, summary judgment in favor of IDOC was still appropriate because no reasonable jury could find that Stutler was transferred in retaliation for complaining of Rockett's conduct. Warden Gramley stated that he temporarily reassigned Stutler to the business office because he thought that relocating Stutler out of physical contact with Rockett might be a solution to the problem.

*Id.*

---

[4]As suggested earlier, it appears from the evidence that this was not so much a "policy" of the county but a condition imposed at the plaintiff's own request.

As in *Stutler* and *Place,* there is no evidence in this case that the corrective action taken by the employer was in any way motivated by a desire to retaliate. In fact, the evidence suggests that the idea of ensuring that O'Brien and Wilson would not be alone together came from O'Brien herself, and that this chaperoning was only in force so long as O'Brien felt it was necessary. Ultimately, O'Brien's grievances stem from the kinds of discomfort that would invariably follow any discrimination complaint made against one's boss in a small office. Her argument essentially relies upon the county's failure to fire or transfer Wilson, but that level of response is not required by Title VII. *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir. 1991) ("An employer's remedy should persuade individual harassers to discontinue unlawful conduct. We do not think that all harassment warrants dismissal.") In a large corporation or government entity, perhaps, it might have been possible to transfer Wilson or allow the plaintiff to transfer to another similar department. But the context of this case is the Langlade County (pop. 20,740) Veterans Service Office, a small office staffed by only three individuals – Wilson, O'Brien and Schleinz – one of whom (O'Brien) was only part-time. Although the county's solution may not have been ideal for the plaintiff, there is no evidence that the county's corrective actions – and, ultimately, its decision to retain Wilson – had any retaliatory motive whatsoever. Thus, to the extent the plaintiff's retaliation claim is based on the county's corrective measures and its continued employment of Wilson, the claim does not withstand summary judgment.

In addition to citing the corrective measures taken by the county, the plaintiff also relies on other negative actions that followed her complaint about Wilson's behavior. Among other things, she states that she was given the "cold shoulder" by Schleinz, who at one point slammed a desk drawer. She felt like an outsider. O'Brien was given "extraordinary work measures," which

15

amounted to an increased work load as well as work she was not trained on, although her hours stayed the same or decreased. (PPFOF ¶ 54.) Wilson no longer engaged in much communication with her, and subjected her work to scrutiny. (PPFOF ¶ 57.) She also states that others retaliated against her. For instance, Stowe, the corporation counsel, at one point told her that the law did not protect her from being mistreated. (He denies this.) In addition, the board prohibited her from tape recording meetings.

The county argues these conditions are not severe enough to constitute retaliatory actions. Both parties rightly focus on *Burlington Northern v. White,* 126 S.Ct. 2405, in which the Supreme Court promulgated a somewhat modified standard for determining when an employer's actions could constitute retaliation. The crux of *Burlington'*s holding clarified that retaliatory conduct need not be limited to the workplace: "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Id.* at 2412. As pertinent here, however, the Court also adopted the Seventh Circuit's test for retaliatory conduct, which asks whether "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (citations omitted). In this objective analysis, the salient distinction is between retaliatory acts that would actually dissuade a reasonable worker from making a discrimination charge and those acts that are more akin to snubbing or other minor rebuffs: "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* Applying that standard to the case before it, the Court concluded that a jury could reasonably have found that the employee's reassignment to a less desirable location and a lengthy suspension without pay amounted to retaliatory conduct.

16

Here, taking the evidence in the light most favorable to the plaintiff, I conclude a jury could not reasonably find that the actions she complains of would have deterred a reasonable employee from making a discrimination complaint. In addition to the cold shoulder of a co-worker, the plaintiff suffered unspecific scrutiny by her boss and was given additional work to do, although she was not forced to work longer hours. There is no indication, other than her own subjective experience, that the workplace was materially different or such a less desirable place to work that the adverse conditions would be expected to chill a Title VII complaint. Most of plaintiff's grievances result from the fact that Wilson was not fired or transferred and reflect the inevitable level of discomfort that follows a formal complaint that one's boss has violated Title VII. But, as noted earlier, Title VII does not require the drastic measure of firing an individual if the discrimination can be checked, as here, with a reprimand and a suspension. Neither does Title VII consider minor slights and uncomfortable situations to be retaliation, especially when such annoyances are based largely on the employee's own subjective experience. Accordingly, I conclude that a jury could not reasonably find retaliation under the facts alleged, and the motion for summary judgment will therefore be granted in its entirety.

**IV. Conclusion**

Taking the facts in the light most favorable to the plaintiff, no reasonable jury could find a violation of Title VII. Moreover, any claims brought against defendant Wilson under 42 U.S.C. § 1983 have not been pursued. Accordingly, the defendants' motion for summary judgment is **GRANTED**, and the case is **DISMISSED**.

**SO ORDERED** this __8th__ day of February, 2007.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
